## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAUN CLIFTON-SHORT, | : |
| | : |
| Petitioner, | : Civ. No. 17-6193 (KM) |
| | : |
| v. | : **OPINION** |
| | : |
| STEVEN JOHNSON, et al., | : |
| | : |
| Respondents. | : |

## KEVIN MCNULTY, U.S.D.J.

### I. INTRODUCTION

The petitioner, Shaun Clifton-Short, is a state prisoner proceeding *pro se* with a petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Clifton-Short has filed a separate

motion for an evidentiary hearing. For the following reasons, Mr. Clifton-Short's petition and

motion will be denied and a certificate of appealability shall not issue.

### II. BACKGROUND

On direct appeal, the New Jersey Superior Court Appellate Division summarized Mr.

Clifton-Short's state criminal proceedings, and the relevant evidence underlying his resulting

convictions, as follows:[1]

> In the early morning hours of January 31, 2007, a murder occurred
> at a gas station in Orange, New Jersey. No one witnessed the
> incident, and the station's manager discovered the murdered
> employee inside an office in the back of the station's outside kiosk.
> The victim was found covered in blood, and the medical examiner
> on the scene concluded the victim died of "[m]ultiple blunt force
> trauma to the head" in a homicide.

---

[1] State court factual findings are presumed correct unless rebutted by clear and convincing
evidence. *See* 28 U.S.C. § 2254(e)(1).

One day later, [Mr. Clifton-Short] and another man were arrested in connection with a separate incident, a robbery at a Dunkin' Donuts. After two individuals were injured there, surveillance tape showed two persons, later identified as [Mr. Clifton-Short] and his brother, walking toward the Dunkin' Donuts, then running away from it a few minutes later. During the course of their subsequent arrest, police found a hammer in the pocket of [Mr. Clifton-Short].

Homicide investigator Christine Witkowski, who had been called to the murder scene two nights earlier, questioned [Mr. Clifton-Short] about the Dunkin' Donuts robbery and also questioned him about the gas station incident. [Mr. Clifton-Short] told Witkowski that he and his brother went to the gas station .... He claimed the attendant repeatedly told him and his brother to leave the station or else he would call the police. When they did not immediately leave, [Mr. Clifton-Short] claimed the attendant took a hammer and swung it at him, narrowly missing. [Mr. Clifton-Short] then took the hammer from the attendant, striking him until the attendant fell to the floor. The attendant got up, and a more lengthy physical confrontation ensued, with the parties hitting each other multiple times. The attendant eventually was knocked unconscious. He and his brother then left the gas station with the hammer in their possession.

[Mr. Clifton-Short] admitted he wore blue jeans, a blue jacket, a brown hooded sweatshirt, and sneakers on the night of the murder. Upon obtaining a search warrant and searching [Mr. Clifton-Short]'s house, Witkowski found and collected each of those items. While [Mr. Clifton-Short] did not dispute that he made the incriminating statements to Witkowski, he testified at trial that he confessed to the Dunkin' Donuts robbery because he was coerced and threatened by the police officers during his interrogation. He also claimed Witkowski told him he would go to jail whether he testified or not.

[Mr. Clifton-Short] moved to suppress the statement he provided to police, claiming it was the product of coercion. The court denied the motion, finding [Mr. Clifton-Short] knowingly and voluntarily waived his *Miranda*[2] rights. [Mr. Clifton-Short] also filed a pro se motion to suppress evidence obtained when he was stopped, along with his brother, on February 1, 2007. He argued he was illegally stopped and searched, and therefore all evidence obtained during the search and seizure should be suppressed. The court denied this motion. [FN2: *Miranda v. Arizona*, 384 U.S. 436 (1966).]

Both at the time the court conducted the *Miranda* hearing and just before the testimonial stage of the trial commenced, [Mr. Clifton-Short] sought removal of his trial counsel. The court granted [Mr.

Clifton-Short]'s second motion to represent himself, but also appointed trial counsel as standby counsel. The court subsequently denied [Mr. Clifton-Short]'s motions for a substitute standby counsel and for a continuance to allow him time to prepare his case.

In addition to the suppression motions and the motions to relieve his attorney, [Mr. Clifton-Short] filed additional motions: (1) to sever the two cases, (2) for a bill of particulars, (3) for a continuance to seek funding for a DNA expert, (4) to adjourn the trial date, (5) to dismiss the indictment for failure to provide an arraignment, (6) for Grand Jury voting record, (7) to suppress crime scene and autopsy reports, (8) to dismiss Counts Eight and Nine of the indictment, and (9) to suppress an out-of-court identification. During trial, the court denied or rendered moot each of these motions.

The jury found [Mr. Clifton-Short] guilty of second-degree conspiracy to commit robbery, *N.J.S.A.* 2C:5–2 (Count One); first-degree robbery, *N.J.S.A.* 2C:15–1 (Count Two); first-degree purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1) (Count Three); first-degree felony murder, *N.J.S.A.* 2C:11–3a(3) (Count Four); fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5d (Count Five); third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d (Count Six); second-degree conspiracy to commit robbery, *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:15–1 (Count Seven); first-degree robbery, *N.J.S.A.* 2C:15–1 (Count Eight); second-degree aggravated assault, *N.J.S.A.* 2C:12–1(b), as a lesser-included offense of first-degree attempted murder, *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3 (Count Nine); first-degree attempted murder, *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3 (Count Ten); fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5d (Count Eleven); and third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d (Count Twelve).

At sentencing, the court imposed a life sentence with a thirty-year parole disqualifier on the first-degree murder conviction and the first degree felony murder conviction, (Counts Three and Four), and a consecutive fifty-two-year sentence with an eighty-five percent parole disqualifier under the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, on the first-degree robbery convictions (Counts Two and Eight), the second-degree aggravated assault conviction, and the first-degree attempted murder conviction (Counts Nine and Ten).

The court dismissed Count One, second-degree conspiracy to commit robbery, as merged into Count Two; Count Five, fourth-

3

degree unlawful possession of a weapon, as merged into Count Six, third-degree possession of a weapon for an unlawful purpose; Count Seven, second-degree conspiracy to commit robbery, as merged into Count Eight, first-degree robbery; and Count Eleven, fourth-degree unlawful possession of a weapon, as merged into Count Twelve, third-degree possession of a weapon for an unlawful purpose. The four-year sentence imposed on Count Six, third-degree possession of a weapon for an unlawful purpose, and the four-year sentence imposed on Count Twelve, third-degree possession of a weapon for an unlawful purpose, were to be served concurrently with the sentences imposed on Counts Two, Three and Four.

*State v. Clifton-Short*, No. A-5817-08T4, 2012 WL 4009080, at *1-2 (N.J. Super. Ct. App. Div. Sept. 13, 2012).

On September 13, 2012, the Appellate Division affirmed Mr. Clifton-Short's conviction. *See id.* at *10. The New Jersey Supreme Court denied certification of Mr. Clifton-Short's direct appeal. *See State v. Clifton-Short*, 65 A.3d 261 (N.J. 2013).

On July 10, 2013, Mr. Clifton-Short filed a Verified Petition for Post-Conviction Relief ("PCR") with the Superior Court of New Jersey, Law Division, Essex County. (DE 8-15, at 4.) Following oral argument, the court denied Mr. Clifton-Short's PCR in a letter opinion dated July 21, 2014. (*Id.* at 15.) The Appellate Division subsequently affirmed the denial of Mr. Clifton-Short's PCR petition. *See State v. Clifton-Short*, No. A-0197-14T1, 2017 WL 787003 (N.J. Super. Ct. App. Div. Mar. 1, 2017). Petitioner's request for certification to the New Jersey Supreme Court was denied. *See State v. Clifton-Short*, 169 A.3d 984 (N.J. 2017).

On August 9, 2017, Mr. Clifton-Short filed the § 2254 Petition that is now before this Court. (DE 1.) On November 13, 2017, Respondents submitted their answer. (DE 7.) Mr. Clifton-Short filed a traverse (DE 17), as well as a motion for an evidentiary hearing, (DE 18).

## III. STANDARD OF REVIEW

An application for a writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Mr. Clifton-Short filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The

AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *See id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256. 289-90 (3d Cir. 2008). Furthermore, the court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). Additionally. AEDPA deference is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *See Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citation omitted). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *See id.* (citations omitted). To the extent that a petitioner's constitutional claims are unexhausted, a

6

court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn.* 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700. 728 (3d Cir. 2005).

## IV. DISCUSSION

### A. Ineffective Assistance of Counsel

The majority of Mr. Clifton-Short's claims allege ineffective assistance of trial counsel.[2] The Sixth Amendment guarantees defendants effective assistance of counsel during critical portions of a criminal proceeding. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012). The Supreme Court, in *Strickland v. Washington,* 466 U.S. 668 (1984), articulated a two-prong burden for demonstrating the ineffectiveness of counsel: (1) that, considering all relevant circumstances, counsel's performance fell below an objective standard of reasonableness, and (2) that the

---

[2]     I briefly recap the events surrounding Mr. Clifton-Short's decision to represent himself. On the day jury selection was set to begin in his trial, Mr. Clifton-Short requested to waive his right to counsel and proceed *pro se.* (DE 8-26 at 3.)  The trial court initially denied this request. (*Id.* at 52.)  The following day, however, Mr. Clifton-Short renewed his request to proceed *pro se.* (DE 8-27 at 4.)  The trial court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), to determine whether Mr. Clifton-Short was knowingly and voluntarily waiving his right to counsel. (*Id.* at 52-53.)  After determining that Mr. Clifton-Short was knowingly and voluntarily waiving his right, the trial court granted Mr. Clifton-Short's request and also appointed Mr. Clifton-Short's trial counsel to act as standby counsel. (*Id.*)  Mr. Clifton-Short, upset by the trial court's appointment of standby counsel, absented himself from the majority of the trial. *See Clifton-Short*, 2017 WL 787003, at *8.

Generally, "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *Faretta*, 422 U.S. at 834 n.46; *see also Southerland v. Nogan*, Civ. No. 18-9469, 2019 WL 1379883, at *9 (D.N.J. Mar. 26, 2019).  Nor does any constitutional claim arise from the ineffectiveness of standby counsel, because there is "no constitutional right to standby counsel." *See United States v. Tilley*, 326 F. App'x 96, 96-97 (3d Cir. 2009) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984)). "'[W]ithout a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel.'" *United States v. Oliver*, 630 F.3d 397, 414 (5th Cir. 2011) (quoting *United States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1998)); *see also Abbott v. Gigliott*, Civ. No. 08-1310, 2010 WL 411830, at *4 (W.D. Pa. Jan 28, 2010), *aff'd*, 457 F. App'x 103 (3d Cir. 2012). Nevertheless, I will address each of the petitioner's claims of ineffective assistance, including the ones that occurred after Mr. Clifton-Short began to represent himself.

petitioner suffered prejudice as a result. *See id.* at 687–96; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013).

In addressing the first prong, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690. Judicial scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Counsel's strategic choices made after thorough investigation of the relevant law and facts are "virtually unchallengeable," while choices made with less than entirely thorough investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *see also Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006); *Gov't of V.I. v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 1996). Whether counsel acted in a manner that was deficient is measured by a standard of "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 687–88; *see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove resulting prejudice. *See Strickland,* 466 U.S at 693. Prejudice is generally found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely

8

than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citation omitted).

*Strickland* made it clear that a court may apply the two prongs in whichever order it sees fit. *See Strickland,* 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *see also Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010).

The ineffective assistance issue here receives a second level of deference. Strictly speaking, I am not reviewing whether counsel's assistance was ineffective; I am reviewing the state courts' determination that counsel's assistance was *not* ineffective. To warrant relief, the state court's application of the *Strickland* standard must have been not merely incorrect but unreasonable. *See Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009); *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007).

### i. Failure to Investigate

Mr. Clifton-Short first alleges that his trial counsel was ineffective for failing to investigate alleged tampering and cross-contamination of DNA evidence. (DE 1 at 20; DE 17 at 10-11.) The DNA evidence collected from the Dunkin Donuts robbery, he claims, was commingled with evidence from the gas station murder investigation. (*See id.*) He bases this assertion upon two evidence receipts from the New Jersey Central Regional Laboratory. These, he claims, demonstrate that a black ski mask from the robbery was placed into a box of evidence from the

9

murder investigation. (DE 17 at 9-10; DE 17-1 at 26-37.) The cross-contamination argument, he says, was relevant to his defense that his cousin (also identified as his brother), not he, was the guilty party. Mr. Clifton-Short submits that if trial counsel had investigated and called as witnesses the two State DNA analysts who tested the evidence, they would have testified that cross-contamination occurred. (DE 8-17 at 33.)

Mr. Clifton-Short raised this claim during his PCR proceedings. The Appellate Division held that he had proffered "no basis to believe that the State's DNA testing was flawed or compromised in any respect." *Clifton-Short*, 2017 WL 787003, at *5. The claim, wrote the Appellate Division, was "simply speculative." *Id.* Accordingly, the Appellate Division upheld the denial of an ineffective assistance of counsel claim. *See id.*

This was not an unreasonable application of the *Strickland* standard. Under *Strickland*, defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A failure to investigate potentially exculpatory evidence or witnesses may form the basis of an ineffective assistance of counsel claim where the petitioner can demonstrate that he was prejudiced by the alleged failure. *See id.* at 690-91; *see also Brown v. United States*, Civ. No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). To successfully establish such a claim, a petitioner must "make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained ... and whether such information, assuming admissibility in court, would have produced a different result." *See Brown*, 2016 WL 1732377, at *5 (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)).

Here, Mr. Clifton-Short has not made even a threshold showing as to what an investigation into the allegedly commingled evidence would have revealed. Mr. Clifton-Short states that the if

10

DNA analysts had been called as witnesses, they would have testified as to the cross-contamination. (DE 17 at 33.) There is no support—for example, an affidavit from one of the analysts—for this speculation. Consequently, Mr. Clifton-Short has not demonstrated what information trial counsel would have discovered if he had investigated the DNA evidence receipts, nor has he established how this investigation would have produced a different outcome in his case. *See Brown*, 2016 WL 1732377, at *5..

The assertion that cross-contamination occurred is no more than that—an assertion. Even assuming that a ski mask from the robbery was at some point placed into a box containing evidence from the murder, that fact alone does not establish cross-contamination that affected the DNA analysis, as the Appellate Division found:

> Defendant and PCR counsel argue trial counsel failed to investigate whether the State's DNA analysis was "flawed or compromised" because the clothing of defendant and his brother was not collected until they arrived at headquarters, allowing for opportunity for cross-contamination while they were transported to headquarters. However, he presented no evidence of cross-contamination or even that the two suspects were transported together. Once seized at the station, defendant's clothing was kept on a separate table from his brother's clothing.

> Defendant argues trial counsel failed to investigate irregularities in the DNA evidence, the chain of custody, and possible tampering. However, he failed to provide "affidavits or certifications," which "asserts the facts that an investigation would have revealed.." *Cummings, supra*, 321 N.J. Super. at 170. As the PCR court found, defendant proffered "no basis" to believe "the State's DNA testing was flawed or compromised in any respect."

[State's exhibit 15, page 13 (App. Div. Op.)]

In addition, other DNA evidence, not subject to cross-contamination, pointed to guilt. The night Mr. Clifton-Short was arrested for his suspected involvement in the Dunkin Donuts robbery, law enforcement removed items of clothing he was wearing and logged it into evidence. (DE 8-37, at 6-11, 107-12.) Later that evening, however, Mr. Clifton-Short admitted that he was also present at the gas station on the night of the murder. (DE 8-34, at 168) ON the

11

night of the gas station incident, he said, he had been wearing blue jeans, a brown sweatshirt, a blue cap, and sneakers. (*Id.* at 163. I will refer to these items as the "gas station clothing.") The gas station clothing, he said, was currently located in the bedroom of his home. (DE 8-34, at 155, 163.) Law enforcement thereafter obtained a search warrant for Mr. Clifton-Short's residence and located the gas station clothing. (*Id.* at 175-180.) Those items of clothing were collected directly from Mr. Clifton-Short's residence and taken directly to the New Jersey State Police Laboratory. (*Id.* at 180.) The gas station clothing was introduced in evidence at trial. The DNA analyst supervisor, Ms. Moses, testified that the blood stain on the blue jeans and brown sweatshirt matched the DNA of the gas station murder victim. (ECF No. 8-36, at 22-24.) This damning DNA evidence is unaffected by the claim of cross-contamination in the police car or at the police station on the night of the Dunkin' Donuts arrest.

Finally, other overwhelming evidence in this case establishes that the alleged cross-contamination could not have affected the result. Among other things, Mr. Clifton-Short confessed that he had struck the gas station owner with the hammer, contending only that the owner had first pulled the hammer on him.

There was no legal error, let alone unreasonableness, in the Appellate Division's citation or application of the *Strickland* standard. The challenge boils down to a challenge to the fact finding of the PCR after a full and fair hearing. *See* 28 U.S.C. § 2254 (presumption of correctness of state court factual findings).

Mr. Clifton-Short is not entitled to relief on this claim.

### ii.   Failure to File Suppression Motion

Mr. Clifton-Short next alleges his trial counsel was ineffective for failing to file a motion challenging the police stop that led to his arrest. (DE 1 at 22; DE 17 at 14.) Mr. Clifton-Short

12

contends that his initial detainment by police was illegal and if trial counsel had filed a "motion to suppress" based upon the theory that there was no basis for the stop, the motion would have resulted in the dismissal of some or all of his charges. (DE 1, at 23.) The State submits that Mr. Clifton-Short cannot demonstrate that he was prejudiced by defense counsel's failure to file this motion because Mr. Clifton-Short, acting *pro se*, submitted this very motion to the court. (DE 7 at 33-37; *see also* DE 26 at 52-55.) After hearing oral argument from both Mr. Clifton-Short and the State, the trial court denied the motion, finding that the officers had a reasonable and articulable suspicion to detain Mr. Clifton-Short. (*Id.* at 65.) Mr. Clifton-Short later challenged this ruling on direct appeal. *See Clifton-Short*, 2012 WL 4009080, at *9. The Appellate Division held that Mr. Clifton-Short's claim lacked "sufficient merit to warrant discussion in a written opinion."

Mr. Clifton-Short argued during his PCR proceedings that trial counsel was ineffective for failing to file a suppression motion. The Appellate Division affirmed, holding that since Mr. Clifton-Short had failed to demonstrate that the outcome of the motion would have been different if it had been raised by counsel, rather than by Mr. Clifton-Short himself. *Clifton-Short*, 2017 WL 787003, at *7. The Appellate Division added that the suppression motion was ultimately without merit and that trial counsel was not ineffective for failing to file a meritless motion. *See id.*

When a petitioner alleges that his trial counsel was ineffective for failing to litigate a Fourth Amendment claim, the petitioner must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *see also Wharton v. Vaughn*, 722 F. App'x 268, 273-74 (3d Cir. 2018). Under the Fourth Amendment, individuals are protected from unreasonable searches and seizures, subject to certain well-delineated exceptions. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Katz*

*v. United States*, 389 U.S. 347, 357 (1967)). One such exception is called a *Terry* stop, named after the United States Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1, 26 (1968). *See United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018). "In *Terry v. Ohio*, the [United States] Supreme Court held that an officer may stop an individual, question him briefly, and perform a limited pat-down frisk for weapons, so long as the stop is justified by reasonable, articulable suspicion of criminal activity having occurred or being imminent. An officer is allowed to consider personal observations and the collective knowledge of several law enforcement personnel in determining whether reasonable suspicion exists." *United States v. Thomas*, 74 F. App'x 189, 191 (3d Cir. 2003) (citing *Terry*, 392 U.S. at 26). Reasonable suspicion requires only "a minimal level of objective justification," but the officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Foster*, 891 F.3d at 104 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)).

I find no error in the Appellate Division's holding that Mr. Clifton-Short failed to demonstrate any prejudice resulting from the motion's submission on a *pro se,* rather than a counseled basis. The trial court did in fact consider the motion, and denied it. As the Appellate Division found, the trial court had a sound legal basis for finding that the stop of Mr. Clifton-Short had been properly based upon a reasonable and articulable suspicion.

The Appellate Division's adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law. The officer who stopped Mr. Clifton-Short personally observed the surveillance video from the Dunkin Donuts depicting the suspected individuals and he was provided with a still photograph of the suspected individuals. (DE 8-35 at 30-31.) The officer also received physical descriptions of the subjects from his commanding officer. (*Id.* at 32-33.) Thus, when the officer recognized two men in the vicinity of the Dunkin

14

Donuts who matched the description of the two suspects, one of whom was wearing the same distinctive jacket with orange lining that was pictured in the video, he had a reasonable, articulable suspicion to stop the two men. The trial court and Appellate Division arrived at this same conclusion. (DE 8-26 at 60-65; DE 8-20 at 18.)

Mr. Clifton-Short is not entitled to relief on this claim.

### iii.      Failure to Procure Evidence from the State

In his Ground Three, Mr. Clifton-Short contends his trial counsel was ineffective for failing to obtain additional evidence from the State. (DE 1 at 24-25.) Specifically, Mr. Clifton-Short claims trial counsel should have investigated the security guard from Dunkin Donuts who was referred to in one of the State's police reports, and should have obtained further surveillance videos from the State. (*Id.*)

#### a.  Failure to Investigate Dunkin Donuts Security Guard

Mr. Clifton-Short submits his trial counsel should have investigated the security guard who, according to a police report, was in the vicinity of the Dunkin Donuts around the time of the robbery and called the police to report the crime. (DE 1 at 26.) Mr. Clifton-Short claims that this incident report was altered by the State to remove the security guard's name and to change key details of the incident. (*Id.*) Thus, he contends, the guard's testimony, if obtained, would have contradicted the State's "altered" police report and benefited his case. (*Id.* at 27; DE 17 at 24.)

Mr. Clifton-Short raised this claim during his PCR proceedings. In addressing the issue, the Appellate Division held as follows:

> Defendant also claims trial counsel was ineffective for not investigating, interviewing, and calling as a witness a security guard who, after the after the robbery at Dunkin' Donuts, was contacted by one of the victims, and called 9–1–1. Again, defendant failed to provide "affidavits or certifications" which "assert the facts that would have been revealed." *Petrozelli, supra*, 351 *N.J. Super.* at 23

15

(quoting *Cummings, supra*, 321 *N.J. Super.* at 170).

> Similarly, there was no merit to defendant's general claims that trial counsel did not investigate and uncover evidence, because defendant did not provide "affidavits or certifications" which "assert the facts that an investigation would have revealed." *Cummings, supra*, 321 *N.J. Super.* at 170.

*Clifton-Short*, 2017 WL 787003, at *6.

A trial counsel's failure to investigate potential witnesses may form the basis of an ineffective assistance of counsel claim if a defendant can demonstrate that he suffered prejudice as a result. *See Strickland*, 466 U.S. at 690-91; *see also Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). To successfully establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained ... and whether such information, assuming admissibility in court, would have produced a different result." *Brown*, 2016 WL 1732377, at *5 (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted). A petitioner may not merely speculate as to what a witness, iof called, might have said. *See Duncan v. Morton*, 256 F.3d 189, 202 (3d Cir. 2001) (citing *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989)). Rather, a petitioner must present sworn testimony from the witness in order to establish that he suffered prejudice as a result of trial counsel's failure to investigate. *See id.*

Mr. Clifton-Short's claim regarding the security guard and the alteration of the report is supported by nothing beyond his own say-so. He has not provided any statement from the security guard. The alleged altering of the incident report and its divergence from the security guard's statements are based on nothing more than speculation. Absent any concrete indication as to what the security guard saw at the time, Mr. Clifton-Short is unable to establish that the result of his

16

trial would have been different if the guard had been investigated and called as a witness. *See Duncan*, 256 F.3d at 202. Accordingly, the Appellate Division's adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

Mr. Clifton-Short is not entitled to relief on this claim.

### b.  *Failure to Obtain Surveillance Videos*

Mr. Clifton-Short also states in Ground Three that trial counsel failed to obtain important surveillance videos that would have helped establish his innocence. (DE 1 at 25.) He contends that police reports included detailed descriptions of surveillance videos taken from the scene, but that the State failed to provide those videos to the defense. (DE 1 at 25-26; DE 17 at 20.) Trial counsel, he says, simply "refused to retrieve" the videos from the State and credulously accepted the State's assertion that they did not possess the videos. (DE 17 at 23-24.)

This argument was rejected by the Appellate Division on appeal from Mr. Clifton-Short's PCR proceedings. *See Clifton-Short*, 2017 WL 787003, at *6. The State represented to the court that although officers went into various neighboring establishments looking for surveillance footage, most of the videos contained nothing useful and were not retained. *See id.* The Appellate Division held that the State was only required to provide defendants with exculpatory evidence that is within the State's possession. There was no evidence that any such videos from the various establishments were in the State's possession or were favorable to the defense. *See id.* Consequently, the Appellate Division found there was not a reasonable probability that videos could have been disclosed that would have altered the result of the trial. *See id.*

"[T]he failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation." *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (quoting *United States v. Baynes*, 622 F.3d 66, 69 (3d Cir. 1980)). In

*Strickland*, the United States Supreme Court held that trial counsel has "a duty to make reasonable investigations," and that an attorney's decision not to investigate certain evidence "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Under this standard, a petitioner must demonstrate what specific information the investigation would have produced if counsel had investigated and how this information would have altered the outcome of the petitioner's case. *See Brown*, 2016 WL 1732377, at *5.

Here, Mr. Clifton-Short has failed to establish that he was prejudiced by trial counsel's failure to investigate. As the Appellate Division emphasized, there was no evidence that any of the surveillance videos were exculpatory. *See Clifton-Short*, 2017 WL 787003, at *6. Mr. Clifton-Short has not provided any support for his belief that these additional surveillance videos would have been "favorable and material" to his defense. (DE 17 at 20.) Without any proof as to what the allegedly favorable evidence the videos contained and how that evidence would have altered the outcome of his trial, Mr. Clifton-Short is unable to demonstrate that he was prejudiced by the failure to investigate. Accordingly, Mr. Clifton-Short has not established that the Appellate Division's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law.

Mr. Clifton-Short is not entitled to relief on this claim.

### iv.    Failure to Confront State's Witness

Mr. Clifton-Short next alleges his trial counsel rendered ineffective assistance by failing to "confront and address the blatant perjury committed by the State's witnesses." (DE 1 at 28; DE 17 at 26.) Mr. Clifton-Short contends that several of the State's witnesses who testified at trial – Detective Witkowski, Detective Koundry, Detective Rodriguez, and Detective McPherson –

provided false testimony. (DE 1 at 28-31; DE 17 at 18-37.) Mr. Clifton-Short argues that his trial attorney's failure to object to these perjurious statements resulted in prejudice because the statements were a "contributing factor" in his conviction. (DE 17 at 35.)

Most of the testimony to which Mr. Clifton-Short points concerned his interrogation and subsequent confession. Specifically, Mr. Clifton-Short he cites the following alleged discrepancies in the detectives' testimony: Detective Witkowski lied about whether she had previously met Mr. Clifton-Short before the interrogation occurred and about the precise time she arrived at the police station to take Mr. Clifton-Short's statement; Detective Koundry lied about whether he had an audio recorder in his possession when he walked into the interrogation room, about whether Mr. Clifton-Short appeared intoxicated when providing his statement, and about whether Detective Juliano was already in the interrogation room when Detective Koundry arrived; and Detective McPherson[3] lied about the hammer being recovered from Mr. Clifton-Short's person and about being the only arresting officer. (DE 1 at 28-31; DE 17 at 26-37.) Mr. Clifton-Short also adds that his trial counsel failed to question Detective Rodriguez about whether he had threatened or coerced Mr. Clifton-Short into providing a false confession. (DE 17 at 29.)

When this contention raised was raised on PCR, the PCR court held as follows:

> Defendant argues his trial counsel failed to address blatant perjury from the same four law enforcement witnesses discussed in Point 13, supra. He seizes on perceived inconsistencies in and between the detectives' testimonies. Most of them are inconsequential; many are not accurate. He asserts that if every point had been properly made, the trial result would have been different.
>
> Defendant was found in possession of a hammer, DNA evidence

---

[3] Mr. Clifton-Short does not mention in his Petition which officer allegedly lied about the hammer having been recovered from Mr. Clifton-Short's person and being the "only arresting officer." (DE 1 at 29-30.) I presume that Mr. Clifton-Short is referring to Detective McPherson here, since McPherson was the officer who arrested Mr. Clifton-Short and conducted a pat down search of Mr. Clifton-Short's person which led to the discovery of the hammer. (DE 8-35 at 31.)

> showed blood on the hammer matched the victim's blood. He gave
> a full confession. The result would not have been any different, even
> if trial counsel had pursued every unimportant, nearly meaningless
> or contrived inconsistency. The evidence was overwhelming and
> "[u]nder the harmless error analysis, any prejudice to defendant was
> not such that created a real possibility that the jury arrived at a result
> it otherwise might not have reached." State v. Marreo, 148 N.J. 469,
> 492-493 (1997).

(DE No. 8-15 at 13.)

The Appellate Division, too, rejected this claim, holding that the issue "lack[ed] sufficient

merit to warrant discussion." *Clifton-Short*, 2017 WL 787003, at *11. The Appellate Division

added that "[the] defendant failed on all of his claims to show a prima facie case of 'a reasonable

probability that ... the result of the proceeding would have been different'" but for trial counsel's

alleged errors. *Id.* (quoting *State v. Parker*, 53 A.3d 652, 658 (N.J. 2012)).

Here, Mr. Clifton-Short is unable to demonstrate that he was prejudiced by trial counsel's

failure to cross-examine these witnesses with their perceived inconsistent statements. As the PCR

court and Appellate Division both found, Mr. Clifton-Short did not establish that the confrontation

of these witnesses would have produced a different result in the outcome of his trial. Mr. Clifton-

Short fails to acknowledge, moreover, that his trial attorney *did* cross-examine each of the

detectives about the voluntariness and accuracy of the confession. (DE 8-37 at 85-91.) Upon

cross-examination of Detective Koundry, for example, defense counsel asked:

> Q: And umm, what exactly happened when you walked in the
> [interrogation] room?
>
> A: I had umm Detective Juliano Mirandize him verbally --
>
> Q: You said you had him. You were --
>
> A: I directed Detective Juliano to verbally Mirandize him and I told
> him that I would like to speak to him and take a statement from him
> regarding a robbery that happened the night before at Dunkin
> Donuts.

Q: Okay. And he just said okay, I'll tell you what happened?

A: Yes.

Q: No hesitation on his part?

A: Nope.

Q: Just like that, he just, okay start -- he started talking and you went into a -- you told him who you were, good evening, you told him who -- who Detective Juliani (sic) was -- or Juliano, and you just went into the Miranda rights, or he did, and he just told you exactly what happened?

A: Yes.

(DE 8-37 at 85-91.)

Defense counsel similarly cross-examined Detective Witkowski:

Q: And about what time did you get [to the East Orange police station]?

A: I would say approximately 2 o'clock.

Q: 2 a.m.?

A: Yes.

Q: And [Mr. Clifton-Short and his cousin] were in custody?

A: Yes.

[. . .]

Q: And according to your Preamble, Miranda Hearing, that was introduced into evidence, that was done around 5:22 in the morning?

A: Yes.

Q: So, he was -- when I say "he," I mean Mr. Short was there as far as you know, at least three hours because he was there for three and a half hours already?

A: Correct, sir.

21

[. . .]

Q: Did you know if anyone had spoken to him before you had walked in?

A: I know that East Orange detectives had been with him prior to my arrival.

Q: Besides the statement. I know he spoke to them about the East Orange thing, but I'm talking about with regard to this case.

A: No one had been in there talking to him regarding this case prior to.

Q: No one at all?

A: No one.

Q: So, you and Detective Cassidy just walked into the room?

A: Yes, Sir.

[...]

Q: You just walked into the room, and you assumed he was going [to] like spill his guts out?

A: No.

Q: You didn't have any idea what he was going to do?

A: I had no idea, sir.

Q: So, no one had interviewed him before. I'm talking about the homicide?

[...]

A: No one spoke with him regarding the homicide.

(DE 8-35 at 5-6, 9.)

Defense counsel also elicited testimony from Mr. Clifton-Short himself about the alleged involuntariness of his confession. (DE 8-38 at 54-55.) Mr. Clifton-Short testified that he had been

22

threatened into providing a false confession and that the detectives were lying about what occurred in the interrogation room. (*Id.* at 12-19.) Defense counsel then used all of this testimony during his closing argument to again attempt to undermine the credibility of Mr. Clifton-Short's confession. (*Id.* at 54-55.) Trial counsel's summation included the following:

> You heard my client testify today about the statements. He was forced to make those statements. He was threatened, that was scared, he was afraid. [. . .] You heard Detective Witkowski testify that she turned on the recorder as soon as she walked into the room. You heard Lieutenant Koundry testify, same thing. Ladies and gentlemen, you need to bring your common sense with you when you come sit here and deliberate. Don't you think they spoke to him before this? And I asked him, he just blurted out admitting this and admitting that. You think that really happened? You really think that happened? Or did they talk to him? And tell him what the facts were? And then they just sat down with him and this kid was scared. He admitted today, he was scared. He was even threatened, he says.

(*Id.*)

The PCR court's and the Appellate Division's decisions were not an unreasonable application of law. I concur that the issue of sufficiency of cross-examination does not rise to the level of requiring habeas relief, and that in any event the error is harmless in context.

As for the allegation that Detective Rodriguez was lying about having discovered the hammer on Mr. Clifton-Short's person, Mr. Clifton-Short does not point to any inconsistencies as such. (DE 1 at 30.) Mr. Clifton-Short states only that a second officer had been with Detective Rodriguez on the night of the arrest, and that this other officer "was previously suspended from the force due to his indictment involving tampering with official records, falsifying police reports, assault and terroristic threats." (*Id.* at 29.) He provides no support for these assertions. Nor does he explain why, even if a second, highly impeachable officer was present, that would undermine the credibility of the officer who did seize the hammer and did testify.

At any rate, defense counsel did wholly fail to address the issue of the seizure of the

hammer from Mr. Clifton-Short, although he opted as a matter of strategy to attack the chain of custody. On cross-examination of Detective McPherson, defense counsel asked how the detective knew the hammer he recovered from Mr. Clifton-Short's person was the same hammer that had been used in the crimes.

> Q: You patted down the guy with the leather jacket?
>
> A: Yes.
>
> Q: And you found that [referring to the hammer]?
>
> A: Yes.
>
> [...]
>
> Q: You can be sure that's the hammer you took from him?
>
> A: Yes.
>
> Q: How could you be sure?
>
> A: I'm looking right at it. It's the same hammer he had in his back pocket.
>
> Q: It is a regular ball-peen hammer?
>
> A: Yes, it is.
>
> Q: Do you know it's the hammer he had on him?
>
> A: Yes.
>
> Q: How do you know, you put a marking on it?
>
> A: I didn't put a marking on it.
>
> Q: How do you know it's exactly the hammer?
>
> A: I seen some blood stains on the head of the hammer that was on there when I took it from him.
>
> Q: Are you identifying the blood stains on there?

A: I'm no blood expert, but I happened to see this is the hammer.

Q: But you didn't put a marking on it?

A: No.

(DE 8-36 at 36-37.)

Defense counsel also questioned Detective Rodriguez, who logged the hammer into evidence:

> Q: I understand that. When the arrest was made, you went to the scene when the arrest was made. Isn't that correct?
>
> A: Yes, ma'am -- yes, sir.
>
> Q: And you observed the individuals there?
>
> A: Yes, sir.
>
> Q: And do you know where the hammer came from?
>
> A: I was inform[ed] that it came --
>
> Q: No, no. I just ask you if you know from your own knowledge, you said Lieutenant -- at the time, Sergeant Koundry gave it to you?
>
> A: Yes, sir.
>
> Q: You don't know where it came from, he just gave it to you. Right?
>
> A: Yeah. He gave it to me.

(DE 8-37 at 115-16.)

Mr. Clifton-Short also testified at trial that the police did not discover a hammer on his person when he was arrested. (DE 8-38 at 20.) Evidently the jury did not believe him.

Given the foregoing, Mr. Clifton-Short has not demonstrated that he was prejudiced by trial counsel's failure to cross-examine these State witnesses with each perceived inconsistent statement. During cross-examinations of the witnesses, defense counsel attempted to undermine

25

the reliability of Mr. Clifton-Short's confession and the hammer evidence. Defense counsel elicited testimony from Mr. Clifton-Short about his version of events, which contradicted the testimony of the officers. Defense counsel then used this information to urge the jury to find the detectives' version of events not credible. Mr. Clifton-Short has not established that if defense counsel had cross-examined the witnesses with each of these perceived inconsistencies, that there is a reasonable probability that the outcome would have been different. Accordingly, the Appellate Division's adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

Mr. Clifton-Short is not entitled to relief on this claim.

### v. Failure to Object

In his fifth ground for relief, Mr. Clifton-Short asserts his trial counsel rendered ineffective assistance by failing to object to the admissibility of the State's DNA evidence. (DE 1 at 31, DE 17 at 37.) At the time of Mr. Clifton-Short's trial, the analyst who performed the laboratory tests on the DNA evidence, Ms. Wheldon, was no longer employed by State's laboratory. *See Clifton-Short*, 2017 WL 787003, at *9. Ms. Wheldon's supervisor, Ms. Moses, who oversaw the performance of the tests, was presented to testify about the report instead. *See id.* Mr. Clifton-Short now argues that he was denied the opportunity to confront Ms. Wheldon about the report and that trial counsel should have objected to Ms. Moses' being permitted to testify. (DE 1 at 32; DE 17 at 39–40.)

The Appellate Division denied this claim on appeal from the PCR proceedings. (DE 8-15 at 13; DE 8-20 at 23-28.) In arriving at its decision, the Appellate Division noted case law, postdating Mr. Clifton-Short's trial, which held that a supervisor or independent reviewer may testify as to scientific reports generated by another only if the witness has "independently verified

26

the correctness of the machine-tested processes and results, and has formed an independent conclusion about the results." *See Clifton-Short*, 2017 WL 787003, at *9 (internal citation and quotation marks omitted). However, the Appellate Division held that trial counsel's performance must be evaluated in accordance with the law that existed at the time of trial, When Mr. Clifton-Short's case was tried in 2008, "there was not a reasonable probability that a Confrontation Clause objection would have been sustained by the trial court" based upon state and federal jurisprudence at the time. *Id.* at *9-10 (internal citation and quotation marks omitted) (alterations in original). The Appellate Division further added that Mr. Clifton-Short was unable to demonstrate prejudice: "Even if Ms. Wheldon could not be produced, Moses may have been able to perform an independent analysis of the test she supervised," and even setting aside Ms. Moses' testimony, there was still overwhelming evidence of Mr. Clifton-Short's guilt. *Id.* at *10. Therefore, the Appellate Division concluded Mr. Clifton-Short could not demonstrate that the result of his proceedings would have been different if trial counsel had objected to Ms. Moses' testimony. *See id.*

Under federal law, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690; *see also United States v. Davis*, 394 F.3d 182, 189 (3d Cir. 2005). It is "only in a rare case" where counsel may be deemed deficient for failing to "make an [argument] which could not be sustained on the basis of the existing law as there is no general duty on the part of defense counsel to anticipate changes in the law." *United States v. Davies*, 394 F.3d 182, 189 (3d Cir. 2005) (quoting *Gov't of V.I. v. Forte*, 865 F.3d 59, 62 (3d Cir. 1989)) (internal quotation marks omitted) (alteration in original). Indeed, there is "no holding of the Supreme Court clearly establishing that to perform within the wide range of

reasonable professional assistance, counsel must accurately predict how the law will turn out or hedge every bet in the hope of a favorable development." *Dorvil v. Sec'y, Fla. Dep't of Corr.*, 663 F. App'x 852, 860 (11th Cir. 2016) (internal citation and quotation marks omitted).

Here, the Appellate Division's determination that defense counsel was not deficient for failing to predict a change in the law was not contrary to, or an unreasonable application of, clearly established federal law. Based upon the law that existed at the time of Mr. Clifton-Short's trial in 2008, there is little likelihood that such an objection would have been successful. As the Appellate Division emphasized, it was not until several years after Mr. Clifton-Short's trial that the New Jersey courts held that surrogate witnesses must independently reach their own conclusions about a laboratory analysis performed by another. *See State v. Rehmann*, 17 A.3d 278, 281-82 (N.J. Super. Ct. App. Div. 2011) (stating that "new difficulties, not previously experienced by our courts, have followed in *Melendez-Diaz*'s wake [. . .] [o]ur courts have yet to consider this surrogate-witness problem" and concluding that "[a]fter careful consideration [. . .] [t]he State must provide a witness who has made an independent determination as to the results offered [by laboratory tests or other scientific results]").

Moreover, Mr. Clifton-Short has not demonstrated that the outcome of his trial would have been different if counsel had objected. He has not established that there is a flaw in the DNA evidence that would have been uncovered by cross-examination of Wheldon, as opposed to Moses. As the Appellate Division held, even setting aside Ms. Moses' testimony, there was still overwhelming independent evidence of Mr. Clifton-Short's guilt.

Mr. Clifton-Short is not entitled to relief on this claim.

### vi.    Failure to Request Jury Charge

In Ground Six, Mr. Clifton-Short asserts that his trial counsel was ineffective for failing to

28

request a jury charge on the lesser included offense of passion/provocation manslaughter. (DE 1 at 33; DE 17 at 43.) Mr. Clifton-Short alleges that there existed a "rational basis" for the passion/provocation charge based upon the testimony he provided at trial. (DE 17 at 45-48.) Specifically, Mr. Clifton-Short points to his own testimony that the murder victim first swung the hammer at him. (*Id.* at 47.)

The Appellate Division denied this claim during Mr. Clifton-Short's PCR proceedings. *See Clifton-Short*, 2017 WL 787003, at *11. The Appellate Division held, in pertinent part:

> In the PCR court, defendant argued standby counsel was ineffective for not requesting a passion/provocation instruction. However, there was no evidence to justify requesting such an instruction. *See, e.g.*, *State v. Funderburg*, 225 *N.J.* 66, 80 (2016) (requiring the defendant be actually impassioned). Even defendant's statement to police, which he testified was false, "would at most support the theory that [he] acted in self-defense; it would likely not support a theory that [he] was actually impassioned." *Id.* at 82–83. "'[T]o justify a lesser included offense instruction, a rational basis must exist in the evidence for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense.'" *Id.* at 81 (citation omitted). Because the evidence did not support a rational basis for such an instruction, defendant cannot show prejudice. Thus, even if he could claim standby counsel was ineffective, his claim fails.

*Id.*

United States Supreme Court precedent does not require the instruction of the lesser included offenses of manslaughter in non-capital cases. *See Urcinoli v. Cathel*, Civ. No. 05-4776, 2010 WL 5253524, at *17 (D.N.J. Dec. 17, 2010) (citing *Smith v. Spisak*, 558 U.S. 139, 148-49 (2010)). However, even in a capital case the lesser instruction is only warranted if it is supported by the evidence. *See Hopper v. Evans*, 456 U.S. 605, 611-12 (1982). "The federal rule is that a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.'" *Id.* (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)).

Here, the Appellate Division's denial of this claim was not contrary to, or an unreasonable application of, federal law. In Mr. Clifton-Short's confession, he stated that he and his cousin (or brother) went into the gas station to ask the attendant for money for a bus ride. (DE 8-34 at 159.) The victim asked him and his cousin to leave, but they did not. (*Id.*) According to Mr. Clifton-Short, the victim then picked up a hammer, asked the men to leave again, and when they did not, the victim swung the hammer at Mr. Clifton-Short but missed. (*Id.* at 159-160.) Mr. Clifton-Short stated that he then took the hammer from the victim and began to strike the victim with it multiple times. (*Id.* at 46-47.) The evidence presented at trial by the medical examiner indicated that the victim was struck fifteen times with blunt force, consistent with the use of a hammer, and that the victim ultimately died from that trauma. (DE 8-35 at 46-57.) In reviewing the evidence presented at trial, it is reasonable to conclude, as the New Jersey Appellate Division did, that only a self-defense charge was warranted and that a passion/provocation charge was not supported by the evidence. Because this passion/provocation defense, as determined by state law, was not supported by the evidence, counsel was not ineffective for not requesting that it be charged. "An attorney cannot be ineffective for failing to request a charge to which the defendant was not entitled." *DeJesus v. D'ilio*, Civ. No. 13-5778, 2017 WL 66391, at *13 (D.N.J. Jan. 6, 2017) (citing *Gov't of V.I. v. Lewis*, 620 F.3d 359, 372 (3d Cir. 2010)).

Mr. Clifton-Short is not entitled to relief on this claim.

### B. Trial Court Error

In Ground Seven, Mr. Clifton-Short contends the trial court violated his right to counsel under the Sixth Amendment, as well as his due process rights under the Fourteenth Amendment, by denying him "substitute" counsel. (DE 1 at 35; DE 17 at 49.) Mr. Clifton-Short states that he and his assigned trial counsel became "embroiled in irreconcilable conflict" and that he informed

the trial court on multiple occasions about his deep dissatisfaction with his attorney. (DE 1 at 35-36.) Mr. Clifton-Short states that the trial court erred by disregarding his concerns about his attorney and denying his request for substitute counsel. (Id. at 36.) Yet, Mr. Clifton-Short does not cite to an occasion, or even allege that an occasion occurred, where he specifically requested assignment of new counsel.

I have reviewed the trial record. The only application I find occurred after Mr. Clifton-Short, at his own insistence, was granted permission to proceed *pro se.* The trial court required current counsel to remain on a standby basis. Mr. Clifton-Short then requested that a different attorney to be appointed as standby counsel. (DE 8-29 at 6.) The trial court denied that request. (*Id.* at 11.)

Initially, I note that this claim appears unexhausted as it was not raised by Mr. Clifton-Short on either direct appeal or during his PCR proceedings. On direct appeal, Mr. Clifton-Short raised a related but distinct claim that the trial court abused its discretion by proceeding with the trial, using standby counsel, even after Mr. Clifton-Short voluntarily absented himself from the proceedings. *See Clifton-Short*, 2012 WL 4009080, at *7. Mr. Clifton-Short again raised a similar but distinct claim during his PCR proceedings that "trial counsel failed to adequately represent him, forcing him to represent himself." *See Clifton-Short*, 2017 WL 787003, at *7. Thus, Mr. Clifton-Short's current claim, that the trial court violated his rights by failing to appoint substitute counsel, was never fairly presented to the state courts. As stated previously, a habeas petitioner must "fairly present all federal claims to the highest state court before bringing them in federal court" in order to ensure that state courts have the "initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Leyva*, 504 F.3d at 365. However, to the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the

31

merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn.* 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein*, 404 F.3d at 728 (3d Cir. 2005). Out of caution, I will consider the merits of Mr. Clifton-Short's claim that he was entitled to substitute standby counsel.

The Sixth Amendment guarantees the right to counsel and the right to effective assistance of counsel. *See* U.S. Const. amend. VI; *see also Strickland*, 466 U.S. at 686 ("the Court has recognized that the right to counsel is the right to the effective assistance of counsel.") The Sixth Amendment does not, however, guarantee an absolute right to the counsel of the defendant's choice. *See Wheat v. United States*, 486 U.S. 153, 159 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer who he prefers."); *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.") The Sixth Amendment only requires competent representation, not a "meaningful relationship" between a defendant and his counsel. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). "[N]ot every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (citing *Morris*, 461 U.S. at 13-14). Rather, the ultimate question is whether "the conflict between [the defendant] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Id.* at 1026. However, if the conflict is of the defendant's own making, that does not constitute a constructive denial of a defendant's Sixth Amendment right to counsel. *See DeSavage v. Lawler*, Civ. No. 08-92, 2010

32

WL 411754, at *5 (W.D. Pa. Jan. 28, 2010) (citing *Schell*, 218 F.3d at 1026-27); *see also Plumlee v. Maston*, 512 F.3d 1204, 1211 (9th Cir. 2008) (*en banc*) (finding there is no Supreme Court case law that "stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust" and finding that *Morris* in fact indicates the contrary).

Here, Mr. Clifton-Short has not demonstrated that the trial court erred by denying him substitute counsel. The PCR court, in addressing whether defense counsel had been ineffective for failing to communicate with his client, held that the "obvious impediment to effective communication" between Mr. Clifton-Short and his attorney had been Mr. Clifton-Short's own actions. (DE 8-15 at 10.) The Appellate Division similarly found that, after reviewing the record, is was clear Mr. Clifton-Short "created this issue with trial counsel to manipulate the system" and that "counsel nonetheless continuously advocated for defendant both as trial counsel and as standby counsel." *See Clifton-Short*, 2017 WL 787003, at *8.

Indeed, shortly after Mr. Clifton-Short absented himself from trial, defense counsel described his interactions with his client to the trial court:

> [. . .] I went to the jail, he walked out on our meeting times -- I should say one time; he didn't communicate with me, another time; and then I went back and then he told me he really didn't want to talk to me, but he would and that kind of thing.
>
> So I've had trouble communicating with him all along. I guess his other attorneys did too, his private attorneys [. . .]

(DE 8-34 at 45.)

Thus, it appears the conflict between Mr. Clifton-Short and his assigned counsel was a conflict of Mr. Clifton-Short's own making. Mr. Clifton-Short's failure to communicate with his attorney does not constitute a constructive denial of his Sixth Amendment rights. *DeSavage*, 2010

33

WL 411754, at *5.

Most significantly Mr. Clifton-Short also had no constitutional right to standby counsel, let alone a right to substitute standby counsel of his choice. *See Tilley*, 326 F.3d at 96-97. The trial court did not violate Mr. Clifton-Short's constitutional rights by denying him substitute standby counsel.

Mr. Clifton-Short is not entitled to relief on this claim.

### C. Cumulative Error

In Mr. Clifton-Short's traverse, he asserts that, taken together, all his claims for relief amount to cumulative error. (DE 17 at 55-57.) Mr. Clifton-Short raised this issue for the first time in his reply brief. (*Compare* DE 1, *with* DE 17.) A habeas petitioner "may not raise new issues and present new factual matters in a reply brief that [they] should have raised in [their] initial brief." *Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015); *see also Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief."); *see also Johnson v. D'Ilio*, No. 15-2641, 2018 WL 4442221, *1 n.1 (D.N.J. Sept. 17, 2018) ("A habeas petitioner, however, cannot raise new claims in a reply.").

Even if Mr. Clifton-Short's claim of cumulative error were cognizable, it would fail on the merits. To constitute redressable "cumulative error," the deficiencies must overall have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hein v. Sullivan*, 601 F.3d 897, 917 (9th Cir. 2010) (citing *Donnelly*, 416 U.S. at 643). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotations and citations omitted). Here, none of Mr. Clifton-Short's grounds for relief

34

were meritorious, and he has not demonstrated actual prejudice resulting from any of alleged deficiencies. In addition, strong independent evidence of guilt rendered any such error harmless.

Mr. Clifton-Short is not entitled to relief on this claim.

### D. Motion for Evidentiary Hearing

Mr. Clifton-Short moves separately for an evidentiary hearing because he has "alleged facts which, if proved, would entitle him to relief." (DE 18 at 18.) A habeas court shall hold an evidentiary hearing on a § 2254 petition under the following prescribed circumstances:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B).

Here, Mr. Clifton-Short has not demonstrated that the facts underlying any of his claims have sufficient merit to warrant an evidentiary hearing. Most or all, moreover, were the subject of adequate hearings in the state court. Accordingly, Mr. Clifton-Short's motion for an evidentiary hearing is denied.

35

## E. CERTIFICATE OF APPEALABILITY

A petitioner may not appeal from a final order in a habeas proceeding where a petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). I find that none of the claims raised in Mr. Clifton-Short's § 2254 meet the foregoing standard, and I will accordingly decline to issue a certificate of appealability.

## V.    CONCLUSION

For the foregoing reasons, Mr. Clifton-Short's § 2254 petition will be denied on the merits. Mr. Clifton-Short's motion for an evidentiary hearing will also be denied. A certificate of appealability shall not issue. An appropriate Order accompanies this Opinion.

DATED: September 24, 2019

KEVIN MCNULTY
United States District Judge